UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | | |
|---|---|---|
| DEANGELO GAINES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:16-cv-00243-JMS-MJD |
| | ) | |
| CORIZON HEALTH, et al. | ) | |
| | ) | |
| Defendants. | ) | |

**Entry Granting Defendants' Motion for Summary Judgment
and Directing Entry of Final Judgment**

**I. Introduction**

Plaintiff Deangelo Gaines was incarcerated at the Putnamville Correctional Facility (Putnamville) when the events alleged in the complaint occurred. He has since been released from custody. Mr. Gaines filed a civil rights complaint regarding the medical care he received while incarcerated at Putnamville. The Court screened the complaint and determined that Mr. Gaines adequately stated an Eighth Amendment deliberate indifference claim against the individual defendants and a policy or practice claim against Corizon Health (Corizon).

Presently pending before the Court is the defendants' motion for summary judgment filed on December 22, 2017. Dkt. 132. Mr. Gaines did not file a response.

The defendants' motion argues that Mr. Gaines's constitutional claims are without merit. Since the filing of the defendants' motion for summary judgment, defendants Michael Rains, Shirley Hughes, and Barbara Oliver have been dismissed from this action. Dkt. 136. For the reasons set forth below, defendants Corizon, Dr. Kiani, Kari Pierce, Farrah Bunch, Kayla McDermit, Dr. Buller, and Finote Asfaw's motion for summary judgment, dkt. 132, is granted.

## II. Summary Judgment Standard

Federal Rule of Civil Procedure 56(a) provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In ruling on a motion for summary judgment, the admissible evidence presented by the non-moving party must be believed and all reasonable inferences must be drawn in the non-movant's favor. *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) ("We view the record in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor."). "When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must—by affidavits or as otherwise provided in this rule—set out specific facts showing a genuine issue for trial. If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party." *Fed. R. Civ. P.* 56(e)(2). The non-moving party bears the burden of demonstrating that such a genuine issue of material fact exists. *Harney v. Speedway Super America, LLC.*, 526 F.3d 1099, 1104 (7th Cir. 2008). The non-moving party bears the burden of specifically identifying the relevant evidence of record, and "the court is not required to scour the record in search of evidence to defeat a motion for summary judgment." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001).

Mr. Gaines failed to respond to the defendants' summary judgment motion. Accordingly, facts alleged in the motion are deemed admitted so long as support for them exists in the record. *See Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003) ("[F]ailure to respond by the nonmovant as mandated by the local rules results in an admission"); *Brasic v. Heinemanns, Inc.*, 121 F.3d 281, 285-286 (7th Cir. 1997) (affirming grant of summary judgment where the nonmovant failed to properly offer evidence disputing the movant's version of the facts). S.D. Ind. Local Rule 56-1

("A party opposing a summary judgment motion must . . . file and serve a response brief and any evidence . . . that the party relies on to oppose the motion. The response must . . . identif[y] the potentially determinative facts and factual disputes that the party contends demonstrate a dispute of fact precluding summary judgment."). This does not alter the summary judgment standard, but it does "reduce the pool" from which facts and inferences relative to the motion may be drawn. *Smith v. Severn*, 129 F.3d 419, 426 (7th Cir. 1997).

### III. Claims

In his complaint, Mr. Gaines sets forth four claims.

First, Mr. Gaines alleges that Corizon, Kari Pierce, Farrah Bunch, Kayla McDermit, Bryan Buller, Houman Kiani, and Finote Asfaw were deliberately indifferent to his back pain; specifically, they would not prescribe pain medication for him or provide free over-the-counter pain medication.

Second, Mr. Gaines alleges that Corizon maintains a policy of discontinuing medication whenever an inmate fails to attend an appointment, which caused his prescription for Neurontin to be terminated when he could not make it to his medical appointment because of his back pain. He claims the decision to discontinue his medication was made based on policy, rather than medical judgment or assessment of his medical need for the medication. Mr. Gaines claims that he addressed his concerns regarding this policy to defendants Kari Pierce, Farrah Bunch, Kayla McDermit, and Dr. Kiani, but his medication was discontinued anyway due to the Corizon policy.

Third, Mr. Gaines alleges that Corizon maintains a policy of removing as many prisoners as possible from the medication Neurontin, regardless of medical need. Mr. Gaines claims that his requests to defendants Dr. Buller and Finote Asfaw that his Neurontin prescription be restarted were denied pursuant to Corizon policy.

Finally, Mr. Gaines alleges that Corizon maintains a policy that prisoners must purchase pain medication from the commissary when not being treated for acute injuries and that pain medication was not given for chronic pain, and that Farrah Bunch and Finote Asfaw denied Mr. Gaines pain medication pursuant to this policy, despite knowing he was in pain and indigent. Dkt. 2; dkt. 8.

### IV. Statement of Material Facts Not in Dispute

The defendants have submitted admissible evidence to establish the following material facts, which were not controverted by Mr. Gaines.

Defendant Dr. Kiani was employed as a physician by Corizon to provide medical care to inmates at Putnamville from August 2015 through December 2015. He left Corizon's employment in February 2016. Dkt. 134-1, ¶¶ 2, 3, 17.

Defendant Dr. Buller was employed as the Regional Medical Director by Corizon. As Regional Director, he did not typically treat inmates. On rare occasions, Dr. Buller would fill in for a physician at one of the prisons as necessary. As Regional Medical Director, his job was to review requests from physicians at Indiana prisons for non-formulary medications and review requests from physicians for outside testing or consultation with specialists. In reviewing requests for non-formulary medications or for outside testing or treatment, Dr. Buller did not make treatment decisions for inmates, but he determined whether the request met certain criteria. Occasionally, Dr. Buller provided alternative treatment suggestions or guidance to the treating physicians at the prisons, but he did not tell them what medications to prescribe or what treatment or tests to order. If a physician at one of the prisons requested a specific medication for an inmate or made a referral to a specialist and Dr. Buller thought that another medication or treatment plan was suitable, Dr. Buller recommended that alternative medication or treatment plan, but the

treating physician at the prison could still prescribe any medication or treatment plan that he or she felt was medically necessary for the patient. Dkt. 134-2, ¶¶ 2, 3. In addition to Dr. Buller, there was an Associate Regional Medical Director who performed the same review of requests as Dr. Buller. Dkt. 134-2, ¶ 4. Every request from a prison physician for non-formulary medications or outside testing or treatment was reviewed either by Dr. Buller or the Associate Regional Medical Director. *Id.*

Defendant Finote Asfaw is an advanced practice nurse (APN) licensed in Indiana. An APN is also called a nurse practitioner (NP). A nurse practitioner is considered a medical provider and can diagnose patients, prescribe medications, and make treatment plans just like a physician. Dkt. 134-3, ¶ 2. From January 2016 through February 2016, NP Asfaw was employed at Putnamville. Dkt. 134-3, ¶ 3.

Defendant Farrah Bunch is a registered nurse, who was employed as the Health Services Administrator (HSA) by Corizon. As HSA, she was employed in a purely administrative role and did not perform nursing duties. As a registered nurse and as the HSA, she did not have the authority to order diagnostic testing, outside provider consults, or medications. As the HSA, RN Bunch would sometimes respond to healthcare request forms and informal grievances. Dkt. 134-3, ¶¶ 2, 3.

Defendant Kayla McDermit is a registered nurse employed by Corizon during the relevant dates in Mr. Gaines's complaint. Dkt. 134-5, ¶ 2. From November 2014 to July 2015, RN McDermit was a staff nurse at Putnamville. In July 2015, RN McDermit was promoted to Director of Nursing ("DON"). In her role as a staff nurse, RN McDermit provided patient care, which included, but was not limited to, assessing patients, obtaining vital signs, reporting her findings to the provider (i.e., a physician or nurse practitioner), and following the providers' orders, such as

administering and dispensing medications. RN McDermit's role as the DON was mostly administrative, but she sometimes performed nursing duties when needed. As a registered nurse and DON, RN McDermit did not have the authority to order diagnostic testing, outside provider consults, or medications, as those are functions of the provider. As the DON, RN McDermit would sometimes respond to informal grievances. Dkt. 134-5, ¶ 3.

Defendant Kari Pierce was employed by Corizon as a medical assistant at Putnamville. As a medical assistant, MA Pierce followed the direction of the doctors and nursing staff regarding what to do with a particular patient. She was able to assess patients, take vital signs, draw blood and she reported her findings to the provider and nursing staff. MA Pierce was not able to prescribe medication, nor was she permitted make any diagnosis or decisions regarding any medical treatment for an inmate. Dkt. 134-6, ¶ ¶ 2, 4.

While an inmate at Putnamville, Mr. Gaines was a patient of the Chronic Care Clinic (CCC) for seizures and hyperlipidemia.[1] Dkt. 134-1, ¶ 5. As a CCC patient, Mr. Gaines was evaluated by a medical provider approximately every 90 days. The medications provided to Mr. Gaines included Lamisil, Neurontin, Lamictal, Remeron, and Aloe Vista gel. Dkt. 134-7, pp. 1-3. Mr. Gaines had a history of drug and alcohol abuse inside the prison. Dkt. 134-1, ¶ 5.

Shortly prior to Dr. Kiani's arrival at Putnamville, on June 27, 2015, Mr. Gaines suffered a seizure. Offenders reported that Mr. Gaines had been snorting crushed up pills and smoking spice, a synthetic drug that mimics the effects of marijuana, prior to the seizure. Dkt. 134-1, ¶ 5; dkt. 134-7, p. 1. Mr. Gaines was administered Narcan, but after the incident, he refused to allow the nurse to take his vital signs or look inside his mouth. He also refused to have his blood drawn. Dkt.

---

[1] Hyperlipidemia is a medical term that means your blood has too many lipids (fats) in it. This increases fatty deposits in arteries and the risk of blockages. www.heart.org

134-7, p. 4. He reported he had not taken his anti-seizure medication the night before. Dkt. 134-1, ¶ 5; dkt. 134-6, ¶ 5; dkt. 134-7, p. 5. MA Pierce documented Mr. Gaines's refusal to sign the Refusal and Release from Responsibility (Refusal) form. Dkt. 134-6, ¶ 5; Dkt. 134-7, p. 4. On August 25, 2015, Mr. Gaines refused to attend his eye doctor appointment. Dkt. 134-7, pp. 5-6.

On September 3, 2015, Dr. Kiani evaluated Mr. Gaines for complaints of neck and back pain. Dkt. 134-1, ¶ 7. Mr. Gaines reported that in, 1997, he was involved in a motor vehicle accident and, as a result, had seizures and pain in his lower neck extending to his lower back. Mr. Gaines denied any new injuries to his neck and back. On exam, Mr. Gaines's vital signs were normal. Dr. Kiani completed a full systems review of Mr. Gaines and found no problems. Dr. Kiani continued Mr. Gaines's prescription for Neurontin. Dr. Kiani also encouraged him to follow the recommended exercise plan and to take Ibuprofen from the commissary. Dkt. 134-1, ¶ 7; dkt. 134-7, pp. 7-10.

That same day, Mr. Gaines refused to see NP Dawson for management of his psychiatric medications. Mr. Gaines again refused to sign a Refusal form. Dkt. 134-7, pp. 11-18.

On September 26, 2015, Dr. Kiani refilled several of Mr. Gaines's medications, including Neurontin, Aloe Vesta, and Lamisil. Dkt. 134-1, ¶ 9; dkt. 134-37, pp. 19-21. All non-formulary orders were reviewed by either the Regional Medical Director or the Associate Regional Medical Director for Corizon. This review was mainly for tracking purposes, but sometimes the reviewer, who is a physician, would make alternative suggestions or provide guidance regarding medications or specific testing. In this case, the reviewer suggested that Dr. Kiani obtain a Neurontin level. *Id*. It is difficult to determine who reviewed the request because the response came from a universal email, but it would have been Dr. Buller or the Associate Regional Medical Director. Dkt. 134-2, ¶ 7. Dr. Kiani ordered a Neurontin level. Dkt. 134-1, ¶ 9; Dkt. 134-7, pp. 22-23.

Neurontin is highly abused and trafficked in the prison setting. Dkt. 134-1, ¶ 9; dkt. 134-2, ¶ 7. Neurontin can induce a calm, euphoric high, much like the high associated with marijuana use and in high enough doses, and can produce psychedelic effects. If not taken as prescribed, Neurontin can cause seizures, which can lead to brain injury or death. Dkt. 134-1, ¶ 9.

On September 29, 2015, MA Pierce was assigned to draw Mr. Gaines's blood for the Neurontin level, but Mr. Gaines refused. Dkt. 134-6, ¶ 6; dkt. 134-7, pp. 24-25. MA Pierce reported Mr. Gaines's refusal to Dr. Kiani. *Id.* MA Pierce did not reschedule the appointment for a subsequent blood draw because Mr. Gaines had refused the blood draw. Dkt. 134-6, ¶ 7. MA Pierce had no other involvement in Mr. Gaines's medical care. Dkt. 134-6, ¶ 10.

Due to Mr. Gaines's refusal to have his blood drawn, his reported prior refusals for appointments, and his significant history of drug abuse while incarcerated, Dr. Kiani discontinued his Neurontin prescription.[2] Dr. Kiani did not discontinue Mr. Gaines's medication because of a Corizon policy. There was no such Corizon policy regarding discontinuing patients' medications. Dkt. 134-1, ¶ 10.

Abruptly stopping medication can be dangerous, so Dr. Kiani slowly weaned Mr. Gaines off of Neurontin. Dkt. 134-1, ¶ 11; dkt. 134-7, pp. 26-27. Prior to his refusal to have his blood drawn, he received two 600 mg tablets twice per day of Neurontin. Dr. Kiani initially reduced this dose to one 600 mg tablet per day for seven days. After seven days, Mr. Gaines received one 300 mg tablet per day for 10 days. After those 10 days, Mr. Gaines stopped receiving Neurontin. *Id.*

---

[2] If a patient does not comply with routine lab testing and follow-up appointments, it was Dr. Kiani's practice to cancel their prescriptions, because he was unable to adequately monitor the patient's use and assess for misuse. The medication could be restarted once the patient complied. Dkt. 134-1, ¶ 10.

On October 3, 2015, Mr. Gaines submitted a Request for Healthcare (RFHC) form complaining of lower back and neck pain. Dkt. 134-1, ¶ 12; dkt. 134-7, pp. 28-33. LPN Gilman evaluated Mr. Gaines and referred him to Dr. Kiani for evaluation. On October 5, 2015, Dr. Kiani evaluated Mr. Gaines for back, neck, and right hand pain. He denied any new injury to his neck or back. On exam, Mr. Gaines's vital signs were normal. Dr. Kiani's review of systems did not reveal any positive findings, such as swelling, deformity, or immobility. Mr. Gaines requested that Dr. Kiani resume his prescription for Neurontin. Dr. Kiani explained to Mr. Gaines that he would continue to wean him off of Neurontin due to his refusal for the lab draw. At the time, Mr. Gaines was still on Neurontin, but at a lower dose. Dr. Kiani's plan going forward was to have Mr. Gaines take over-the-counter medications for his symptoms. *Id.*

On October 7, 2015, Mr. Gaines submitted RFHC # 413925. Dkt. 134-4, ¶ 7; dkt. 134-7, pp. 34-36. In it, Mr. Gaines complained of back pain due to a decrease in his Neurontin dosage. Mr. Gaines explained that Dr. Kiani had decreased his Neurontin dosage because he had failed to appear for a lab draw. Mr. Gaines wanted to speak to the Regional Medical Director to "straighten out this error." RN Bunch responded to the RFHC and explained to Mr. Gaines that he would be placed back on the schedule to have his Neurontin level drawn and that the results would be sent to the Regional Medical Director. *Id.*

On October 23, 2015, Dr. Kiani evaluated Mr. Gaines after he returned from the hospital due to seizure activity. Dkt. 134-1, ¶ 13; dkt. 134-7, pp. 37-38. Mr. Gaines reported that he was doing well and was seizure free. The exam was otherwise unremarkable. On November 21, 2015, Mr. Gaines refused his CCC appointment. Dkt. 134-4, ¶ 8; dkt. 134-7, pp. 39-40.

On December 7, 2015, Mr. Gaines submitted an informal grievance regarding the discontinuation of his Neurontin. Dkt. 134-5, ¶ 7; dkt. 134-7, p. 41. Mr. Gaines claimed that he

did not refuse the lab draw scheduled for September 29, 2015, but rather he missed the appointment due to illness. RN McDermit reviewed the informal grievance and provided a written response. The EMR indicated Mr. Gaines refused the blood draw, so RN McDermit explained that he did not miss the appointment, but instead refused the blood draw. *Id.*

On December 16, 2015, Dr. Kiani evaluated Mr. Gaines for his complaints of intermittent back pain. Dkt. 134-1, ¶ 15; dkt. 134-7, pp. 42-46. Mr. Gaines reported that over-the-counter medication had relieved his back pain. Despite this relief, Mr. Gaines requested that Dr. Kiani restart him on Neurontin. Dr. Kiani's physical exam did not reveal any objective findings that substantiated Mr. Gaines's complaints of back pain. On exam, Mr. Gaines had normal musculature, no skeletal tenderness, no joint deformity, and no swelling to the extremities. Based on Mr. Gaines's improved condition, Dr. Kiani found no clinical reason to start Mr. Gaines on Neurontin. Dr. Kiani ordered a one-month supply of Ibuprofen for Mr. Gaines, as Mr. Gaines reported that over-the-counter medications had relieved his back pain. Dkt. 134-1, ¶ 16; dkt. 134-7, p. 45.

On December 22, 2015, Mr. Gaines submitted RFHC form #427918. Dkt. 134-4, ¶ 10; dkt. 134-7, p. 47. In the RFHC, Mr. Gaines explained that his labs were redrawn and that his Neurontin level had been in the therapeutic range. Mr. Gaines continued to complain of back pain and requested pain medication. On December 23, 2015, RN Bunch responded to the RFHC and explained that Ibuprofen, an anti-inflammatory pain medication, 600 mg, had been ordered for him. As a registered nurse, RN Bunch could not order treatment or medications, including Neurontin or any other pain reliever. Dkt. 134-4, ¶ 11.

On January 15, 2016, Dr. Buller and Dr. Kiani determined that they would not restart Mr. Gaines on Neurontin due to his non-compliance with the blood draw on September 29, 2015, his

refusal for his CCC appointment on November 21, 2015, and Dr. Kiani's assessment on December 16, 2015, that Neurontin was no longer clinically indicated and that over-the-counter medications had helped relieve Mr. Gaines's symptoms. Dkt. 134-1 ¶ 17; dkt. 134-2, ¶ 9; dkt. 134-7, pp. 48-49. This is the last time Dr. Kiani had any involvement in Mr. Gaines's medical care or treatment. Dkt. 134-1 ¶ 17.

On January 20, 2016, NP Asfaw evaluated Mr. Gaines for his complaints of a rash on his penis and lower back pain with movement. Dkt. 134-3 ¶ 7; dkt. 134-7, pp. 50-52. Mr. Gaines requested a refill of Ibuprofen for his back pain. Mr. Gaines walked into the exam room and climbed up on the exam table without effort. On exam, the penile rash was approximately 3cm x 2cm. Mr. Gaines denied pain in his penis, but he did report some itching. There was no drainage or other signs of infection to the penis. Mr. Gaines reported that he had a similar rash about two years ago that cleared up with hydrocortisone cream. Mr. Gaines had already been prescribed a cream for his penile rash, but he had not yet picked up the cream. NP Asfaw instructed Mr. Gaines to pick up the cream for the penile rash and he ordered a blood test for syphilis. During his physical assessment of Mr. Gaines, NP Asfaw found no objective findings that would substantiate Mr. Gaines's complaints of pain. Mr. Gaines did not appear in any distress and he was able to move all of his limbs normally and there was no asymmetry in his limbs. NP Asfaw's assessment of Mr. Gaines was negative for fatigue, fever, night sweats, chest pain, irregular heart rate, trouble with urination, other signs of rash or infection, joint or bone abnormalities, and muscle weakness. Mr. Gaines's vital signs were normal. A patient who is in pain would likely have elevated blood pressure, pulse, and respirations. NP Asfaw believed that Mr. Gaines had pain with movement. However, NP Asfaw did not prescribe Ibuprofen because Mr. Gaines's pain was intermittent and NP Asfaw did not find any gross dysfunction in any of Mr. Gaines's movements or limbs. Because

exercise and rest are the best medicine for the type of back pain described by Mr. Gaines, NP Asfaw educated Mr. Gaines on exercises he could do in his cell and instructed Mr. Gaines on how to apply heat and ice to his back to help relieve pain. NP Asfaw also instructed Mr. Gaines to purchase Ibuprofen from the commissary for his complaints of intermittent back pain, as offenders were expected to purchase over-the-counter medication from the prison commissary, unless the condition was deemed a "serious health condition," in accordance with Indiana Department of Correction (IDOC) Healthcare Services Directive. Dkt. 134-8, p. 28. Whether the patient has a "serious health condition" is determined by the provider based on his or her assessment of the patient. Dkt. 134-3, ¶ 7. Based on his assessment, NP Asfaw did not consider Mr. Gaines's intermittent back pain to be a "serious health condition." *Id.*

On February 10, 2016, NP Asfaw evaluated Mr. Gaines for his complaints of lower back pain. Dkt. 134-3, ¶ 10; dkt. 134-7, pp. 59-61. On exam, NP Asfaw found no objective findings to substantiate Mr. Gaines's complaints of pain. Mr. Gaines was able to walk steady and he was able to bend over and touch his toes. Moreover, NP Asfaw found no joint or bone deformity, asymmetry, swelling or discoloration on inspection. Mr. Gaines's vital signs were normal. NP Asfaw ordered an x-ray of Mr. Gaines's lower back. Based on his physical exam of Mr. Gaines, NP Asfaw instructed Mr. Gaines to purchase over-the-counter pain medication from the commissary, as NP Asfaw did not consider Mr. Gaines's intermittent back and neck pain to be a "serious health condition." Dkt. 134-3, ¶ 10; dkt. 134-7, pp. 59-61.

On February 11, 2016, Mr. Gaines's lumbar spine x-ray, which was read and interpreted by an outside radiologist, revealed mild degenerative disc disease at L5-S1, but was otherwise normal. This x-ray finding is common among adults over age 30. Dkt. 134-3, ¶ 11; dkt. 134-7, p. 62.

On February 16, 2016, NP Asfaw updated Mr. Gaines's medical chart with information regarding his seizure medication and the need for Mr. Gaines to wear his seizure helmet at all times. This is the last time NP Asfaw had any involvement in Mr. Gaines's medical care or treatment. Dkt. 134-3, ¶ 12; dkt. 134-7, pp. 63-66.

On March 2, 2016, Mr. Gaines submitted RFHC #43047 complaining of back pain. Dkt. 134-2, ¶ 10; dkt. 134-7, pp. 67-73. In response, Dr. Buller evaluated Mr. Gaines on March 4, 2016. During this evaluation, Mr. Gaines reported that he had experienced back pain for several years as a result of an accident. Mr. Gaines requested that Dr. Buller restart his Neurontin. Dr. Buller reviewed Mr. Gaines's most recent x-rays with him and Dr. Buller explained that the x-rays revealed mild degenerative disc disease at L5-S1. Dr. Buller reassured Mr. Gaines that this finding was quite common and most adults have this same x-ray finding. Later in the exam, Mr. Gaines changed his complaint and stated that his back pain was intermittent and that his neck was the real issue. During his physical assessment of Mr. Gaines, Dr. Buller found no objective findings that substantiated Mr. Gaines's complaint of neck pain. Mr. Gaines did not appear in any distress and he was able to move all of his limbs normally and walk in and out of the exam room without effort.

Dr. Buller's assessment of Mr. Gaines was negative for any issues and his vital signs were normal. Dr. Buller reviewed some of the papers Mr. Gaines brought with him and Dr. Buller reassured him that none of them revealed any serious spine pathology. The only finding was that Mr. Gaines reported mild pain to the left thigh with the straight leg raise test. This was a subjective finding and not related to Mr. Gaines's complaints of neck and back pain. Dr. Buller gave Mr. Gaines a 10-day supply of Naproxen, a non-steroidal anti- inflammatory ("NSAIDs"), and instructed him to purchase NSAIDs from the commissary when the Naproxen card was gone. There was no clinical reason to provide Mr. Gaines with prescription NSAIDs or other pain

relievers because Mr. Gaines's complaints of back and neck pain were not serious and were of a chronic nature. Dr. Buller had no other involvement in Mr. Gaines' medical care and treatment relevant to this lawsuit. Dkt. 134-2, ¶ 10; dkt. 134-7, pp. 67-73

MA Pierce, RN Bunch, and RN McDermit had no involvement in Dr. Kiani's decision to discontinue Mr. Gaines's Neurontin prescription. Dkt. 134-4, ¶ 11; dkt. 134-5, ¶ 8; dkt. 134-6, ¶ 9.

Corizon did not have a policy of discontinuing patient prescriptions if a patient missed an appointment. Dkt. 134-1, ¶ 18; dkt. 134-4, ¶ 16; dkt. 134-5, ¶ 12; dkt. 134-6, ¶ 14. Whether or not a patient's medication was discontinued was solely up to the discretion of the provider.

Corizon did not have a policy or an initiative to "taper" the number of patients receiving Neurontin at Putnamville. Dkt. 134-1, ¶ 18; dkt. 134-3, ¶ 17. There was no Corizon policy that as many offenders as possible be taken off of Neurontin. Dkt. 134-2, ¶ 12. There was no Corizon policy at all regarding Neurontin. *Id.* Whether a patient was on Neurontin was solely up to the provider. Dkt. 134-2, ¶ 12; dkt. 134-3, ¶ 17; dkt. 134-4, ¶ 15. Dr. Buller's decision not to place Mr. Gaines back on Neurontin was not based on a Corizon policy. Dkt. 134-2, ¶ 12. It was based on Dr. Buller's independent medical judgment about what was medically indicated based on Mr. Gaines's history, presentation, and his objective exam.

Corizon did not have a policy that offenders should purchase pain medication from the commissary when they are not being treated for acute injury. Dkt. 134-3, ¶ 7; dkt. 134-4, ¶ 17. Rather, the IDOC had a Healthcare Services Directive that over-the-counter medications should be purchased by the offender from the commissary, unless the condition was deemed a "serious health condition." Whether the patient had a "serious health condition" was determined by the provider based on his or her assessment of the patient. The Directive further states that "when an

offender has trouble obtaining OTCs due to indigence, the issue will not be addressed by healthcare staff. Rather, Facility Heads shall have the authority to provide or withhold these items in much the same way that other hygiene items are managed." Dkt. 134-8; dkt. 134-3, ¶ 7; dkt. 134-4, ¶ 17.

Mr. Gaines alleges that he reported to NP Asfaw that he was indigent and could not buy medication from the commissary in the summer and fall of 2015. Dkt. 134-3, ¶ 13. However, NP Asfaw did not start working at Putnamville until January 2016. *Id*.

Mr. Gaines alleges that NP Asfaw denied Mr. Gaines pain medication in February and April 2016. Dkt. 134-3, ¶ 14. NP Asfaw did not consider Mr. Gaines's intermittent back pain to be a "serious health condition" and instructed Mr. Gaines to purchase over-the-counter medications from the commissary pursuant to the IDOC Directive. Dkt. 134-3, ¶¶ 7 and 10. If Mr. Gaines had trouble purchasing pain relievers from the commissary, he could have requested them from IDOC. *Id*. Additionally, NP Asfaw did not have any involvement in Mr. Gaines's medical care and treatment in April 2016, as NP Asfaw stopped working at Putnamville in February 2016.

Moreover, RN Bunch did not deny Mr. Gaines pain medication. Dkt. 134-4, ¶ 11. As a nurse, RN Bunch could not prescribe medications. Dkt. 134-4, ¶ 3. As the Healthcare Services Administrator, RN Bunch did not perform nursing duties and, therefore, she did not dispense or administer medication to patients, including Mr. Gaines. *Id*.

### V. Discussion

The Court will address each claim of Mr. Gaines's in turn:

A. *Claim One - Deliberate Indifference to Back Pain*:

Pursuant to the Eighth Amendment, prison officials have a duty to provide humane conditions of confinement. This means that officials must take reasonable measures to guarantee

the safety of the inmates and ensure that they receive adequate food, clothing, shelter, and medical care. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). To prevail on an Eighth Amendment claim of deliberate indifference to medical needs, a plaintiff must demonstrate two elements: (1) he suffered from an objectively serious medical condition; and (2) the defendant knew about the plaintiff's condition and the substantial risk of harm it posed, but disregarded that risk. *Id.* at 837; *Pittman ex rel. Hamilton v. County of Madison, Ill.*, 746 F.3d 766, 775 (7th Cir. 2014).

The Court reviews "the totality of an inmate's medical care when considering whether that care evidences deliberate indifference to serious medical needs." *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) (citing *Cavalieria v. Shephard*, 321 F.3d 616, 625-26 (7th Cir. 2003)). The Seventh Circuit has explained that "[a] medical professional is entitled to deference in treatment decisions unless no minimally competent professional would have [recommended the same] under those circumstances." *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014). "Disagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation." *Id.* But deliberate indifference can be inferred in some circumstances, such as when a doctor "persists in a course of treatment known to be ineffective." *Petties*, 836 F.3d at 730 (citing *Walker v. Peters*, 233 F.3d 494, 498 (7th Cir. 2000)). Similarly, deliberate indifference may exist when the course of treatment is "so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate" the inmate's condition. *Snipes v. DeTella,* 95 F.3d 586, 592 (7th Cir. 1996) (internal quotations omitted).

Mr. Gaines alleges that Corizon[3], Kari Pierce, Farrah Bunch, Kayla McDermit, Bryan Buller, Houman Kiani, and Finote Asfaw were deliberately indifferent to his back pain because they would not prescribe pain medication for him or provide free over-the-counter pain medication. However, the evidence, including Mr. Gaines's medical records, do not support this allegation.

1. *Dr. Kiani:*

During the four months Dr. Kiani was a physician employed at Putnamville, he saw Mr. Gaines on three occasions regarding Mr. Gaines's complaints of back pain: September 3, 2015, October 5, 2015, and December 16, 2015. At the September 3rd appointment, Mr. Gaines reported neck and back pain from a previous car accident, but denied any new injuries. Dr. Kiani continued his prescription for Neurontin and encouraged him to follow the recommended exercises and to take Ibuprofen from the commissary.

Soon after, Mr. Gaines's prescription for Neurontin was terminated based on his refusal to have his blood tested to check his Neurontin level, his history of drug and alcohol abuse in prison, and his prior refusals for appointments. On October 5th, Dr. Kiani saw Mr. Gaines for back, neck, and right hand pain. Mr. Gaines again denied suffering any new injuries. Because the prescription for Neurontin was terminated, Dr. Kiani explained that his medical plan to treat Mr. Gaines's pain was over the counter medications.

On December 16th, Dr. Kiani again evaluated Mr. Gaines for back pain. Mr. Gaines reported that the over-the-counter medication relieved his back pain. As a result, Dr. Kianai did not restart his prescription for Neurontin. Rather he ordered a one-month supply of Ibuprofen. This evidence

---

[3] Because Corizon, the corporation, did not provide Mr. Gaines any medical treatment, his claim against them is limited to whether they had a policy or practice of discontinuing medication to inmates.

shows that Mr. Gaines received medically appropriate treatment for his back pain. Each time he complained to Dr. Kiani about back pain, Dr. Kiani evaluated him and either prescribed pain medications or advised him to take Ibuprofen after Mr. Gaines reported it relieved his pain. On one occasion, Dr. Kiani ordered Mr. Gaines a one month supply of Ibuprofen.

Dr. Kiani has shown that the medical care he provided Mr. Gaines was timely, in relation to his complaints, reasonable, and appropriate. Mr. Gaines has presented no evidence to dispute the medical records. As such, Dr. Kiani is entitled to summary judgment on the claim he was deliberately indifferent to Mr. Gaines's back pain.

2. *Kari Pierce*:

Kari Pierce is a medical assistant employed at Putnamville. As a medical assistant, she was not permitted to prescribe medications or make a medical diagnosis or any medical decisions on Mr. Gaines's behalf. In her limited role as a medical assistant, Pierce was assigned to draw Mr. Gaines's blood for purposes of checking Neurontin level, which he refused. Pierce had no further involvement in his medical care. Because Pierce was not able to prescribe medication and provided no medical care to Mr. Gaines, she was not deliberately indifferent to Mr. Gaines's medical needs for failing to provide pain medication. MA Pierce is entitled to summary judgment on the Eighth Amendment claim that she was deliberately indifferent for failing to prescribe pain medication to him.

3. *Farrah Bunch*:

RN Bunch was the HSA. As such, she did not have the authority to order diagnostic testing, outside provider consults, or medications. RN Bunch often responded to healthcare request forms and informal grievances.  Dkt. 134-3, ¶ 3.

On two occasions, RN Bunch responded to Mr. Gaines's RFHCs complaining of back pain and requesting pain medication. In her first response, she notified Mr. Gaines that he would be placed back on the schedule to have his Neurontin level checked. Dkt. 134-7, pp. 34-36. In the second response, she explained that a prescription for 600 mg of Ibuprofen had been ordered for him. Dkt. 134-7, pp. 47. As a registered nurse, RN Bunch did not have an ability to order pain medication for him. Thus, she was not deliberately indifferent to Mr. Gaines's medical needs for failing to provide pain medication. RN Bunch is entitled to summary judgment on the Eighth Amendment claim that she was deliberately indifferent for failing to prescribe pain medication to him.

4. *Kayla McDermit*:

Kayla McDermit was a registered nurse and the Director of Nursing. As such, she performed primarily administrative duties but performed nursing duties as needed. With respect to Mr. Gaines, her involvement with him was limited to responding to his informal grievance. Specifically, in December 2015, Mr. Gaines filed an informal grievance complaining that his Neurontin was discontinued. She responded and informed him it was discontinued because he refused to have his blood drawn for a Neurontin level check. Dkt. 134-7, p. 41.

As a registered nurse and the DON, McDermit did not have an ability to prescribe Mr. Gaines pain medication. As such, she was not deliberately indifferent to his medical needs for failing to provide him pain medication. Nurse McDermitt is entitled to summary judgment on the Eighth Amendment claim that she was deliberately indifferent for failing to prescribe pain medication to him.

5. _Dr. Buller_:

Either Dr. Buller or the Associate Regional Medical Director suggested to Dr. Kiani that Mr. Gaines's Neurontin level be checked. Such a suggestion is not being deliberately indifferent to Mr. Gaines's pain because Neurontin is highly abused and trafficked in the prison setting. Misuse of this drug can cause seizures, and ultimately brain injury or death. Requiring that Neurontin levels be checked of an individual with a history of drug abuse is entirely appropriate and sound medical practice to confirm the patient is taking his medication as prescribed. In January 2016, Dr. Buller and Dr. Kiani agreed that Mr. Gaines should not be restarted on Neurontin based on his non-compliance with the blood draw on September 29, 2015, his refusal to attend his CCC appointment on November 21, 2015, and Dr. Kiani's assessment on December 16, 2015 that Neurontin was no longer clinically indicated and that over-the-counter medications had helped relieve Mr. Gaines's symptoms.

Dr. Buller examined Mr. Gaines on March 4, 2016, two days after Mr. Gaines submitted a RFHC. Based on his examination, he did not find that Mr. Gaines was in any distress and he was able to move all of his limbs normally and walk in and out of the exam room normally. Moreover, Mr. Gaines's vital signs were all normal. Based on this, Dr. Buller gave Mr. Gaines a 10-day supply of Naproxen and instructed him to purchase NSAIDs from the commissary when the Naproxen was gone. Dr. Buller has shown that the medical care he provided Mr. Gaines was timely, reasonable, and appropriate. Dr. Buller is entitled to summary judgment on the Eighth Amendment claim that he was deliberately indifferent for failing to prescribe pain medication.

6. _Finote Asfaw_:

NP Asfaw evaluated Mr. Gaines on four occasions: once for seizures, once for a rash on his penis, and twice for back and neck pain. Each time she examined him for neck and back pain, NP

Asfaw performed a full physical exam and found no objective evidence that substantiated Mr. Gaines's complaints of back and neck pain. She did not deny pain medication to Mr. Gaines. Based on these exams, review of Mr. Gaines's medical records, and x-rays of Mr. Gaines's back, NP Asfaw did not consider Mr. Gaines's complaints of pain a "serious health condition" and provide him with free pain medication. An IDOC Directive stated that over-the-counter medication, such as Ibuprofen, should be purchased from the commissary, unless the condition was a "serious health condition," a determination made by the provider. Dkt. 134-8, p. 28.

NP Asfaw's treatment of Mr. Gaines was reasonable and appropriate. Her refusal to provide him free pain medication based on her determination that his intermittent back and neck pain was not a serious health condition was not deliberately indifferent. NP Asfaw is entitled to summary judgment on the Eighth Amendment claim that she was deliberately indifferent for failing to provide Mr. Gaines with free pain medication.

B. *Policy and Practice Claim against Corizon - Discontinuing Medication*:

Mr. Gaines alleges that Corizon maintains a policy of discontinuing medication whenever an inmate fails to attend an appointment, which he alleges caused his prescription for Neurontin to be discontinued.

Deliberate indifference claims brought pursuant to 42 U.S.C. § 1983 against a corporation like Corizon cannot be based on the theory of *respondeat superior*. *Chaves v. Illinois State Police*, 251 F.3d 612, 651 (7th Cir. 2001); *Moore v. State of Indiana*, 999 F.2d 1125, 1129 (7th Cir. 1993). Because Corizon acts under color of state law by contracting to perform a government function, *i.e*. providing medical care to correctional facilities, it is treated as a government entity for purposes of section 1983 claims. *See Jackson v. Illinois Medi–Car, Inc*., 300 F.3d 760, 766 (7th Cir. 2002).

To state a deliberate indifference claim against Corizon, Mr. Gaines must establish that he suffered a constitutional deprivation as the result of an express policy or custom of Corizon. *Id.* He must show that Corizon has: (1) an express policy that, when enforced, causes a constitutional deprivation; (2) a practice that is so wide-spread that, although not authorized by written or express policy, is so permanent and well-settled as to constitute a custom or usage with the force of law, or (3) an allegation that the constitutional injury was caused by a person with final policy making authority. *Estate of Moreland v. Dieter*, 395 F.3d 747, 758–759 (7th Cir. 2004). In addition, a custom cannot be established through a single incident. *Palmer v. Marion County*, 327 F.3d 588 (7th Cir. 2003).

Mr. Gaines did not designate any evidence that it was the policy, custom, or procedure of Corizon that led to the alleged deliberate indifference to his serious medical need. As Mr. Gaines has not presented a shred of evidence that the termination of his prescription for Neurontin was due to any corporate policy, custom, practice, or procedure of Corizon, the motion for summary judgment must be granted as to this § 1983 claim.

Notwithstanding Mr. Gaines's failure to designate any evidence regarding a Corizon policy to discontinue pain medication when an inmate misses an appointment, Mr. Gaines's prescription for Neurontin was not discontinued because he allegedly missed a medical appointment due to back pain. Rather, Mr. Gaines's prescription was discontinued because he refused to submit to a blood test that medical staff ordered to check his Neurontin levels, his prior refusal to attend medical appointments, and his documented history of drug abuse in prison. Dkt. 134-1, ¶ 10. Mr. Gaines has not disputed this evidence with any evidence of his own showing that his Neurontin prescription was discontinued because he missed an appointment due to back pain.

C. _Policy and Practice Claim against Corizon – Removing Inmates from Neurontin_:

Mr. Gaines next alleges that Corizon maintains a policy of removing as many prisoners as possible from the medication Neurontin, despite medical need. Mr. Gaines claims that his requests to defendants Dr. Buller and Finote Asfaw to be restarted on Neurontin were denied pursuant to Corizon policy.

Again, because Mr. Gaines has failed to respond to the defendants' motion for summary judgment, he failed to designate any evidence that it was the policy, custom, or procedure of Corizon to remove inmates from Neurontin. Therefore, this claim fails and the defendants' motion for summary judgment is granted as to this claim.

Nonetheless, Corizon does not have a policy or practice of removing as many offenders as possible from Neurontin. Whether an inmate is prescribed Neurontin is based on individual determinations by the inmate's medical provider. Mr. Gaines's prescription was discontinued because of his behavior, not a policy.

D. _Policy and Practice Claim against Corizon-Making Inmates Purchase Pain Medication:_

Finally, Mr. Gaines alleges that Corizon maintains a policy that prisoners must purchase pain medication from the commissary when not being treated for acute injuries and that pain medication was not given for chronic pain. He contends that Farrah Bunch and Finote Asfaw denied pain medication to Mr. Gaines pursuant to this policy, despite knowing he was in pain and indigent. Dkt. 2; dkt. 8. Similar to Mr. Gaines's policy and practice claims in sections IV. B and C, here, he failed to designate any evidence that Corizon had a policy or practice of making inmates purchase pain medications from the commissary when not being treated for acute injuries. As such, this claim fails and the defendants' motion for summary judgment is granted as to this claim.

Moreover, the undisputed evidence shows that an IDOC Directive stated that over-the-counter medication, such as Ibuprofen, should be purchased from the commissary, unless the condition was a "serious health condition." Dkt. 134-8, p. 28. If Mr. Gaines was not able to purchase pain medication from the commissary due to indigence, he could have obtained it from prison staff. The Directive specifically states that when an offender has trouble obtaining over-the-counter medications due to indigence, the issue will not be addressed by healthcare staff. However, there is no evidence in the record that Mr. Gaines had trouble purchasing his medication from the commissary due to indigence.

Additionally, Mr. Gaines was not denied pain medication pursuant to Corizon policy. Mr. Gaines was given a ten-day supply of Naproxen by Dr. Buller. Otherwise, he was instructed to purchase Ibuprofen from the commissary.

## VI. Conclusion

For the foregoing reasons, the defendants' motion for summary judgment, dkt. [132], is **granted**. Judgment consistent with this Entry shall now issue.

**IT IS SO ORDERED**.

Date: 6/26/2018

Hon. Jane Magnus-Stinson, Chief Judge
United States District Court
Southern District of Indiana

Distribution:

DEANGELO GAINES
4902 Norwaldo Avenue
Indianapolis, IN 46205

Carol A. Dillon
BLEEKE DILLON CRANDALL, P.C.
carol@bleekedilloncrandall.com

Benjamin Myron Lane Jones
INDIANA ATTORNEY GENERAL
benjamin.jones@atg.in.gov

Britney Jade McMahan
BLEEKE DILLON CRANDALL, PC
britney@bleekedilloncrandall.com

Andrew Scheil
INDIANA ATTORNEY GENERAL
Andrew.Scheil@atg.in.gov